Donald C. Kern, MD, MPH, CCHP
7 Hammond Circle
Sudbury, MA 01776

Jay M. Elias, Esquire
Ratcliffe Burke Harten and Elias LLP
1600 Financial Plaza
Providence, Rhode Island 02903

July 23, 2007

**Re: Thomas Flannery v. Michael Poshkus, M.D.
Expert Report**

Dear Mr. Elias:

I write in connection with the case of *Flannery v. Poshkus*.

I have, as you requested, reviewed the materials you sent me regarding Thomas Flannery. The materials included the initial Complaint filed by Mr. Flannery, his Amended Complaint, and the medical records of the Rhode Island Department of Corrections Adult Correctional Institution.

**Qualifications**

My qualifications to serve as an expert witness in behalf of Dr. Poshkus include the following, all of which are more specifically contained in my Curriculum Vitae, a copy of which is attached to this report:

**Pertinent Employment History:**

| | |
|---|---|
| 7/82 - 8/95 | Staff Physician, Edith Nourse Rogers Memorial Veterans Administration Hospital, Bedford, MA |
| 8/95 - 9/96 | Medical Director, MCI-Shirley |
| 8/95 - 9/96 | Medical Director, MCI-Lancaster |
| 9/96 - 8/97 | Medical Director, MCI-Concord |
| 8/97 - 11/03 | Medical Director, MCI-Old Colony Correctional Center |
| 11/03 – 6/04 | Medical Director; MCI-Cedar Junction |
| 11/03 – 6/04 | Associate Program Medical Director, Program in Health Care and Criminal Justice, Commonwealth Medicine, UMASS Medical School |

| | |
|---|---|
| 7/04 – 7/05 | Medical Director, Correctional Health Services, Health Care Access & Improvement, Department of Health and Mental Hygiene, The City of New York |
| 7/05 – 3/06 | Special Consultant, Correctional Health Services, Health Care Access & Improvement, Department of Health and Mental Hygiene, The City of New York |
| 4/06 – | Consultant in Correctional Health |

**Other offices and appointments:**

| | |
|---|---|
| 1979 - 1981 | Member, Council on Continuing Physician Education, American Medical Association |
| 1980 - 1984 | Delegate from Massachusetts to the American Medical Association-Resident Physician Section |
| 1982 - 1995 | Assistant Professor, Boston University School of Medicine |
| 1983 - 1995 | Assistant Professor, Boston University School of Public Health |
| 1984 - 1991 | Member, Quality Assurance Board, Edith Nourse Rogers Memorial Veterans Administration Hospital, Bedford, MA (Chairman, 1984-1989) |
| 1990 - 1997 | Delegate, Massachusetts Medical Society House of Delegates |
| 1991 - 1997 | Member, Committee on Legislation, Massachusetts Medical Society |
| 1999 - | Physician Surveyor, National Commission on Correctional Health Care |
| 2002 - | Member, Budget Committee, Society of Correctional Physicians |
| 2004 - | Member, Board of Directors, National Commission on Correctional Health Care |

**Membership in Professional Societies:**

- Middlesex Central District Medical Society
- Massachusetts Medical Society
- Massachusetts Public Health Association
- Society of Correctional Physicians
- American College of Physicians
- American College of Preventive Medicine
- American Geriatrics Society

**Certificates and Licenses:**

- Diplomate, National Board of Medical Examiners
- Diplomate in Internal Medicine, American Board of Internal Medicine
- Diplomate in Public Health and General Preventive Medicine, American Board of Preventive Medicine
- Certificate of Added Qualifications in Geriatric Medicine, American Board of Internal Medicine

- Certificate in Geriatrics, Veterans Administration
- Certified Correctional Health Professional, National Commission on Correctional Health Care
- Medical License, Commonwealth of Massachusetts
- Medical License, State of New Jersey
- Medical License, State of New York

**Honors:**

| | |
|---|---|
| 1988 - | Honorary Advisor, Beijing Medical University |
| 1988 - | Fellow, American College of Physicians |
| 1988 - | Fellow, American College of Preventive Medicine |
| 1989 - | Fellow, American Geriatrics Society |

**Elective Offices:**

| | |
|---|---|
| 1986 – | Member, Board of Health, Town of Sudbury, MA (Chairman, 3/88-3/89, 3/91-3/92, 3/93-3/95, 3/97-3/98, 3/00-3/01; 3/03-3/04) |
| 2003 – | Treasurer, Society of Correctional Physicians |
| 2005 – 2006 | Member, Executive Committee, Board of Directors, National Commission on Correctional Health Care |

I have been employed in the medical profession and, in particular, in the correctional medical profession, for more than ten years and have personally provided care to many hundreds of inmate/patients housed in prison facilities in Massachusetts. In addition, as part of quality improvement and accreditation activities, I have personally reviewed the medical records of many hundreds of inmate/patients housed in prisons, jails, and juvenile detention facilities around the United States.

My opinions are based on my review of the documents provided, as well as my knowledge of correctional medicine and complaints of depression, panic attacks, anxiety disorders, and allergies and sensitivities among the incarcerated patient population.

**<u>Opinion and Conclusions</u>**

It is my opinion, to a reasonable degree of medical certainty, that the care and treatment provided to Thomas Flannery during his incarceration at the Rhode Island Department of Corrections Adult Correctional Institution (ACI) from January 2006 until his transfer to a Massachusetts correctional facility in April 2006, was appropriate and either met or exceeded the accepted standards. It is my further opinion, to a reasonable degree of medical certainty, that the actions of Michael Poshkus, M.D., in his capacity as Medical

Program Director of the ACI, either met or exceeded the accepted standards of care in connection with Thomas Flannery.

It appears from my review of the medical records that Mr. Flannery had multiple incarcerations at the Rhode Island ACI. It appears that when Mr. Flannery was a patient in the Rhode Island correctional system in 2001 he denied any mental health problems and there is no evidence that he complained of an allergy to wool, although he did claim an allergy to *penicillin*.

In a later period of incarceration at the ACI in 2002, Mr. Flannery did indicate at the time of his initial intake medical screening that he suffered from depression for which he had received medication. He again indicated that he had an allergy to *penicillin,* and made no mention of any allergy to wool.

During a March 2004 period of incarceration in the ACI, Mr. Flannery provided a history of past mental health treatment. Mr. Flannery was therefore referred to and seen by a psychiatrist at the ACI, but no specific diagnosis was made, and he was not ordered any treatment.

In a later period of incarceration in November 2004, the plaintiff for the first time provided a history of mental health treatment specifically for anxiety. He stated that he had been prescribed *Valium* and *Xanax* two years before for his condition, but was not currently on any medication. He also claimed for the first time a mental health hospitalization in California apparently sometime in 2003. Mr. Flannery was therefore referred to and seen by a mental health counselor at ACI, and he apparently told this person that he had received *Valium* and *Xanax* while in a California prison two years previously, but was on no current therapy. The mental health counselor made no specific diagnosis, and did not refer the plaintiff for evaluation by the psychiatrist.

The next medical screen performed on Mr. Flannery was during a December 2004 period of incarceration during which Mr. Flannery made no mention of any hospitalization for treatment of any mental health condition. During that December 2004 medical screening examination, Mr. Flannery for the first time reported a history of anxiety dating to his childhood, a history of suicide attempts dating to childhood, and for the first time a reference to substance abuse (cocaine).

At the time of his intake medical screening during the incarceration which is the subject of the pending lawsuit, in January 2006, the records reflect the fact that Mr. Flannery provided a history of having been previously prescribed the medications *Klonopin, Remeron,* and *Motrin* during his incarcerations in Massachusetts. He also provided a history of mental health treatment while in prison in Massachusetts. Mr. Flannery did not provide a history of any mental health hospitalizations (as he previously did in referring to a hospitalization in California), nor did he provide a history of previous suicide attempts. Mr. Flannery did confirm the history of substance abuse for cocaine use.

The medical records of the Rhode Island ACI for the plaintiff's January 2006 incarceration reflect the fact that a request for consultation by a psychiatrist was made by a nurse at the time of the plaintiff's medical screen. I find this to be proper and appropriate and within the standard of care.

The nurse who undertook the medical screen had no way to independently confirm the medications mentioned by Mr. Flannery as having been prescribed to him during his Massachusetts incarceration, and so it was proper and appropriate, and within the accepted standard of care, for the nurse to have made a referral for a psychiatric consultation at that time.

On March 16, 2006, the records reflect the fact that the plaintiff was seen by a medical physician, Dr. Edoro, who saw the plaintiff for complaints of tooth pain, a facial rash, and a possible wool allergy. Dr. Edoro wrote orders for *Motrin* and *Erythromycin*, as well as for a cotton blanket. A true allergy to wool is quite rare, and it is my opinion, to a reasonable degree of medical certainty, and based on my education, training, and years of experience in the field of correctional medicine, that the plaintiff's complaint was more consistent with a sensitivity to minimally-processed wool than to an allergy to wool. In any event, the medical records reflect the fact that a cotton blanket was ordered for Mr. Flannery in a timely fashion.

Mr. Flannery's medical records also reflect the fact that shortly after his arrival to the Rhode Island ACI he was placed in segregation. I find this to be relevant to the plaintiff's claims in this lawsuit because prisoners who are segregated from the general inmate population are likely to be more frequently checked on by healthcare professionals than other inmates.

The medical records also reflect the fact that between January 25, 2006, and April 2006, when Mr. Flannery was transferred to a Massachusetts correctional facility, he was seen on at least four occasions by a psychiatrist and once by a social worker. On January 30, 2006, for example, the plaintiff was seen by a psychiatrist, Dr. Bauermeister, after an apparent attempt to see the plaintiff on January 27, 2006. The time period within which the plaintiff was seen, (three business days after arrival at the ACI), was well within the expected norm and the standard of care for incarcerated persons. It was, in fact, far more timely than in the non-incarcerated general population seeking an outpatient appointment with a psychiatrist.

The plan of care formulated by the psychiatrist on January 30, 2006, included prescription of the medication *Wellbutrin,* and the plaintiff was advised that when he was experiencing a panic attack, he was to immediately request care. The nursing staff was instructed to provide immediate treatment for a documented panic attack. This was reasonable, proper, appropriate, and within the accepted standard of care because of the very unclear history from the patient as to his claimed disorders. It is my experience that individuals who suffer from panic disorder (more commonly women) typically can be specific about what it is that triggers the attacks. It was very reasonable of the psychiatrist to want to document the occurrences in this case.

It is my opinion, to a reasonable degree of medical certainty, and based on my education, training, and years of experience in the field of correctional medicine, that some inmates may seek the prescription of *Klonopin* (a controlled substance) and *Remeron*, not for their proper medical indications, but rather for their common side effects, which make patients less aware of their surroundings. Some inmates find these side effects especially desirable when they are confined to segregation.

It is my opinion, to a reasonable degree of medical certainty, that the psychiatrist's plan of care, including the prescription of *Wellbutrin*, was a perfectly feasible and reasonable one based upon the uncertainty of the plaintiff's disorders, his substance abuse history, and the inconsistencies in his mental health history.

The medical records reflect the fact that Mr. Flannery started receiving the *Wellbutrin* on February 1, 2006, but started refusing to take the *Wellbutrin* on February 8, 2006. Regardless, he was seen again by the same psychiatrist on February 13, 2006, during which time the plaintiff offered complaints that the *Wellbutrin* did not help with his panic attacks; however, the records also reflect the fact that the plaintiff was unable to offer a single instance of having reported an occurrence of a panic attack, as he had been instructed to do at the time of his previous psychiatric consultation.

The plaintiff also complained of insomnia at that time, but he refused to participate in a sleep study which was offered to him.

The plaintiff was seen again by the same psychiatrist on February 27, 2006, only fourteen days later. He was again told to contact the nurses when he was experiencing a panic or anxiety attack so that there could be objective data upon which to base an accurate diagnosis. Again, though, the record reflects the fact that Mr. Flannery never did so.

The plaintiff was seen on March 13, 2006, by a social worker. Following that March 13 visit, the social worker referred Mr. Flannery to the psychiatrist for further care. The medical records reflect the fact that the psychiatrist may have attempted to see Mr. Flannery the following day, March 14, 2006, and also that the plaintiff was seen on March 27 by the same psychiatrist who again appears to have questioned the validity of Mr. Flannery's complaints, none of which had ever been independently or objectively verified, as requested.

Mr. Flannery was seen again by the same psychiatrist at the ACI on March 28, 2006, at which time he stated that he was anxious and depressed. The psychiatrist discontinued the *Wellbutrin* and prescribed *Elavil* instead. *Elavil* is a medication which is also used for the treatment of depression and panic disorders, and I find, to a reasonable degree of medical certainty, that the prescription of *Elavil* at that time was an appropriate choice and met or exceeded the applicable standards of care. The plaintiff soon thereafter left the Rhode Island correctional system

During his period of incarceration at the Rhode Island ACI, Mr. Flannery continued to decline sleep monitoring and never sought out a nurse or other healthcare provider to witness a panic or anxiety attack. There was, in essence, no confirmation or objective proof of panic attacks upon which to change the psychiatrist's plan of care. It is my medical opinion, to a reasonable degree of medical certainty, that the care and treatment provided by the healthcare providers at the ACI met or exceeded the applicable standards of care. Accordingly, it is my opinion, to a reasonable degree of medical certainty, that the actions of Dr. Michael Poshkus, in his capacity as the Medical Program Director of the ACI, met or exceeded the applicable standards of care relative to Thomas Flannery.

It is my professional medical opinion to a reasonable degree of medical certainty that the care and treatment provided to Thomas Flannery throughout the period of his incarceration at the Rhode Island ACI in 2006 met or exceeded the applicable standards of care.

Sincerely,

Donald C. Kern

Donald C. Kern, MD, MPH, CCHP